**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN SNOWWHITE,** | ) | |
| | ) | **No. 11 C 8466** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **IBEW LOCAL 117 JOINT** | ) | |
| **APPRENTICESHIP AND TRAINING** | ) | |
| **FUND dba IBEW LOCAL 117 JOINT** | ) | |
| **APPRENTICESHIP AND TRAINING** | ) | |
| **COMMITTEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

In June 2007, plaintiff John Snowwhite, born in 1967, was denied admission into an

electrical worker apprenticeship program operated by defendant IBEW Local 117 Joint

Apprenticeship and Training Fund ("the Fund"). (Pl.'s LR Resp. ¶ 11, 13, 14.)[1] In June 2008, he

---

[1] The parties submissions are cited herein as: Defendant's Motion for Summary Judgment [dkt 34]; Defendant Fund's Memorandum in Support of Summary Judgment (Def.'s Mem.) [dkt 35]; Revised Defendant-Movant L.R. 56.1(3) Statement of Material Facts (Def.'s LR Stmt.) [dkt 51]; Revised Defendant's Exhibits to Motion for Summary Judgment (Def.'s Exs.) [dkt 52]; Defendant Fund's Reply Brief in Support of Summary Judgment (Def.'s Reply) [dkt 56]; Defendant's Fund's Response to Plaintiff's Statement of Additional Material Facts (Def.'s Resp. Add'l Facts) [dkt 55]; Defendant Fund's Opposition for Leave to Amend and Sur-Reply Response (Def.'s Resp. Mot. Am. Compl.) [dkt 69]; Plantiff's Response in Opposition to Defendant's Motion for Summary Judgment (Pl.'s Opp'n) [dkt 43]; Plaintiff's Response to Defendant's Revised Statement of Material Facts (Pl.'s LR Resp.) [dkt 54]; Plaintiff's Statement of Additional Material Facts (Pl.'s Add'l Facts) [dkt 44]; Appendix of Exhibits to Plaintiff's Statement of Additional Material Facts (Pl.'s Exs.) [dkt 45];

was denied again after a re-interview. (*Id.* ¶ 20.) Snowwhite alleges that he was denied admission based on his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (Compl.) [Dkt 1.] The Fund contends that it is not a proper defendant under the ADEA. Before the court are Defendant's Motion for Summary Judgment [dkt 34] and plaintiff's Motion for Leave to File an Amended Complaint [dkt 63]. Oral argument was held on the motion for summary judgment. [Dkt 58.] There is subject matter jurisdiction under 28 U.S.C. § 1331, and the parties have consented to the jurisdiction of a magistrate judge pursuant to 29 U.S.C. § 636. [Dkt 17.] For the reasons stated below, defendant's motion for summary judgment is denied, and plaintiff's motion to amend the complaint is granted.

## Background

In his complaint, Snowwhite alleges that the Fund is a labor organization as defined by the ADEA. (Compl. ¶ 5.) Following oral argument on the Funds' motion, Snowwhite moved to amend his complaint to allege in the alternative that the Fund is an employer or an employment agency, a motion which was taken under advisement. In its motion for summary judgment, the Fund's primary argument is that apprenticeship programs are categorically not covered under the statute. (Def.'s Mem. 5-8.) The Fund also argues that even if apprenticeship programs are covered by the ADEA, the Fund does not fall under the statute because it is not a labor organization, employer, or employment agency as defined by the ADEA. (*Id.* at 8-10, 15.)

---

Plaintiff's Sur-Reply in Opposition to Defendant's Motion for Summary Judgment (Pl.'s Sur-Reply) [dkt 68]; Plaintiff's Motion for Leave to File Amended Complaint (Pl.'s Mot. Am. Compl.) [dkt 63]. The Fund's original Local Rule 56.1 statement (dkt 37) was stricken as containing improper legal argument. [Dkt 50.]

By agreement, discovery has been limited thus far to document exchanges because the parties want to have the motion for summary judgment decided before engaging in more extensive and costly discovery. [*See* dkt 32.]

The Fund is a jointly-managed, employee welfare benefit fund established pursuant to the Employment Retirement Income Security Act ("ERISA") and the Taft-Hartley Act, 29 U.S.C. § 186(c)(5), which "permits employers and unions to create employer-financed trust funds for the benefit of employees so long as employees and employers are equally represented by the trustees of the funds." *See N.L.R.B. v. Amax Coal. Co*, 453 U.S. 322, 325 (1981); *see also* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan"). Pursuant to the terms of their collective bargaining agreement ("CBA"), the Fund was established by IBEW Local 117 ("IBEW") and the Elgin Chapter of the National Electrical Contractors Association ("NECA") to "provide a program for the training and education of electrical apprentices . . . and to defray the reasonable expenses of administering the apprenticeship and training program." (Def.'s Resp. Add'l Facts ¶ 5; Pl.'s Exs., Ex. A., Trust Fund Agreement § 3. ) The Fund is funded by NECA contractors who operate in the Elgin area. (Pl.'s LR Resp. ¶¶ 5, 6.) The Fund is administered by a six member board of trustees with three members appointed by the IBEW and three members appointed by NECA. (*Id.* ¶ 34.) The Fund admits to having at least six employees. (Def.'s Resp. Add'l Facts ¶ 21.) The number of apprentices in the program has varied over the past few years from 47 in May 2007 to 17 in November 2012. (*Id.* ¶¶ 22, 23.)

Under the CBA, the Fund is the only body to train apprentice electricians, and the Fund has "full authority for issuing all job training assignments and for transferring apprentices from one employer to another." (Def.'s Resp. Add'l Facts ¶¶ 10, 11.) The Fund's apprenticeship and training

3

standards have been approved by the Bureau of Apprenticeship and Training and the United States Department of Labor ("DOL"). (Pl.'s Exs., Ex. G, Local Inside Wireman Apprenticeship and Training Standards ("Standards") at D103.) The Standards provide that the Fund shall not discriminate on the basis of age ("except the applicant must be at least 18 years of age to apply"). (*Id.* at D113.)

When an apprentice is accepted by the Fund, the apprentice is required to sign an "Apprenticeship Agreement" which contains the "terms and conditions of the employment and training of the apprentice." (Def.'s Resp. Add'l Facts ¶ 14.) The apprentice's wage rate and work hours are governed by the CBA. (*Id.* ¶ 18; Pl.'s Ex. D, CBA § 5.04.) The CBA provides that the apprentice's wage rate is a fractional percentage of a journeyman's wage rate that increases as the apprentice becomes more experienced. (CBA § 5.04; Standards § 5.) According to the Standards, the Fund "cannot, and does not, employ apprentices. Therefore, it is not obligated to actually employ the apprentice, but shall use every effort to keep the apprentice employed in a reasonably continuous manner with the participating employers." (Standards § 3(N).) The Fund admits that it "monitors the job performance of apprentices," and will take disciplinary action for poor performance. (Def.'s Resp. Add'l Facts ¶ 15.) The Fund states that it does not pay apprentice's wages or deduct taxes on their behalf (Def.'s Exs., Ex. 18, Aff. Thomas McTavish ¶ 19), but admits that it has exercised "its discretion to delay pay raises to apprentices as a means of discipline for poor performance." (Def.'s Resp. Add'l Facts ¶ 16.) The Fund's training and apprenticeship standards provide that if an unsafe working condition is brought to the Fund's attention, the Fund must immediately investigate. (Standards § 3(M).) If an employer fails to respond to a Fund recommendation, apprentices can be removed from the employer or the jobsite. (*Id.*) If an apprentice has a potential grievance about

"wages, hours, working conditions, and other issues covered by the [CBA]," the apprentice must first bring "documented evidence" to the Fund before the apprentice may use the CBA's grievance procedures. (*Id.* § 21(D)(1).) If the Fund suspends or terminates an apprentice, the apprentice is not eligible for any job assignments under the CBA. (*Id.* § 21(B).)

## Statutory Framework

Passed in 1967, the ADEA's stated purpose is to "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). The ADEA generally prohibits an employer, employment agency, or a labor organization to discriminate against any person over the age of 40 because of their age. 29 U.S.C. § 623(a)-(c).

The definitions of employer, employment agency, and labor organization are broad. "The term 'employer' means a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . but such term does not include the United States, or a corporation wholly owned by the Government of the United States." 29 U.S.C. § 630(b). The ADEA circularly defines employees as "an individual employed by any employer." 29 U.S.C. § 630(f). "The term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer and includes an agent of such a person; but shall not include an agency of the United States." *Id.* § 630(c). A labor organization is defined as:

The term "labor organization" means a labor organization engaged in an industry

5

affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

*Id.* § 630(d).

The ADEA grants authority to the Equal Employment Opportunity Commission ("EEOC') to "issue such rules and regulations as it may consider necessary or appropriate for carrying out this chapter, and . . . establish such reasonable exemptions to and from any or all provisions of this chapter as it may find necessary and proper in the public interest." *Id.* § 628.

The substantive provisions of the ADEA "were derived *in haec verba* from Title VII [of the Civil Rights Act of 1964]." *Lorillard v. Pons*, 434 U.S. 575, 584 (1978). Like the ADEA, Title VII forbids discrimination by employers, employment agencies, and labor organizations. *See* 42 U.S.C. § 2000e-2(a)-(c). In a contiguous section, however, Title VII also proscribes discrimination by "any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining." *Id.* § 2000e-2(d). The ADEA does not contain a similar provision, which is the heart of the Fund's argument.

Soon after the ADEA was passed in 1967, the agency then in charge of administering the statute, the Department of Labor ("DOL"), issued an interpretative bulletin stating that "[a]ge limitations for entry into bona fide apprenticeship programs were not intended to be affected by the Act." 34 Fed. Reg. 322, 323 (Jan. 9, 1969). In 1978, Congress transferred the responsibility for enforcing the ADEA to the EEOC. Reorganization Plan No. 1, § 2, 92 Stat. 3781 (1978). In 1987,

the EEOC reaffirmed that bona fide apprenticeship programs were not covered by the ADEA. 52 Fed. Reg. 33809, 33809 (Sept. 8, 1987). Then-EEOC chairman and current-Supreme Court Justice Clarence Thomas defended the interpretation in a letter, stating that Congress's "silence" in the years since the DOL first promulgated its interpretation "suggests [Congress's] consent to the interpretation." (Def.'s Exs., Ex. 1 ¶ 3.) He emphasized that "this conclusion is inescapable where Congress has amended the statute in other ways . . . (as it has the ADEA), but has left the existing interpretation undisturbed." (*Id*.) At least one district court rejected the EEOC's interpretation that apprenticeship programs were not covered by the ADEA, finding the EEOC interpretation to be inconsistent with the "language, purpose, and legislative history of the ADEA." *Quinn v. N.Y. State Elec. & Gas Corp.*, 569 F. Supp. 655, 663 (N.D.N.Y. 1983).

In 1996, the EEOC reversed course, and promulgated through notice-and-comment rulemaking the current regulation providing that apprenticeship programs are covered by the ADEA.

> All apprenticeship programs, including those apprenticeship programs created or maintained by joint labor-management organizations, are subject to the prohibitions of sec. 4 of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. 623. Age limitations in apprenticeship programs are valid only if excepted under sec. 4(f)(1) of the Act, 29 U.S.C. 623(f)(1), or exempted by the Commission under sec. 9 of the Act, 29 U.S.C. 628, in accordance with the procedures set forth in 29 CFR 1627.15.

29 C.F.R. § 1625.21.

## Present Motions

As a preliminary note, the Fund incorrectly styles the issue of whether the Fund is a proper defendant under the ADEA as one of subject matter jurisdiction. Whether the Fund is a proper defendant under the ADEA, however, is not a question of "subject matter jurisdiction but an ordinary

failure to meet a statutory requirement." *Saperstein v. Hager*, 188 F.3d 852, 855 n. 1 (7th Cir. 1999);

*accord Komorowswi v. Townline Mini-Mart and Rest.,* 162 F.3d 962, 964 (7th Cir. 1998).

## I.     The Fund's Motion for Summary Judgment

### Legal Standard

Summary judgment on all or part of a claim or defense is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To oppose a motion for summary judgment successfully, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials showing that a material fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the responsibility of identifying applicable evidence. *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  In determining whether a genuine dispute of material fact exists, the court construes all facts and draw all reasonable and justifiable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255.

### Discussion

### A.     Whether apprenticeship programs are covered under the ADEA

The Fund argues that the ADEA does not cover apprenticeship programs and thus, as a bona fide apprenticeship program, the Fund is not subject to the ADEA.  The Fund contends the Congress

8

has demonstrated implicitly its intent to exclude apprenticeship programs from coverage by explicitly including apprenticeship programs in Title VII but not the ADEA, and by not amending the ADEA in the face of agency interpretations holding that the ADEA did not cover apprenticeship programs. (Def.'s Mem. at 5-8.)

Relying on *EEOC v. Seafarers Intl. Union*, 394 F.3d 197 (4th Cir. 2005), Snowwhite argues that the EEOC's current regulation interpreting the ADEA to cover apprenticeship programs should be afforded the deference described in *Chevron, U.S.A. Inc., v. Natural Resource Def. Council, Inc.*, 467 U.S. 837 (1984). (Pl.'s Opp'n at 7-12.) The Fund counters by pointing to Seventh Circuit decisions reviewing under a *de novo* standard rather than the *Chevron* framework an agency's interpretation of a statute to determine the scope of the agency's own jurisdiction. (Def.'s Reply at 11-13 (citing *N. Ill. Steel Supply Co. v. Sec. of Labor*, 294 F.3d 844, 847 (7th Cir. 2002)).) While the present motions were pending, however, the Supreme Court held that "the distinction between 'jurisdictional' and 'nonjurisdictional' interpretations is a mirage," and, accordingly, "judges should not waste their time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is 'jurisdictional' or 'nonjurisdictional.'" *City of Arlington v. FCC*, ___ U.S. ___, 133 S.Ct. 1863, 1868, 1870 (May 20, 2013). In light of the *City of Arlington* opinion, the *de novo* standard applied in *N. Ill. Steel Supply Co.* is no longer applicable.

Under the *Chevron* framework, at step one the court determines "whether Congress 'has directly spoken to the precise question at issue,'" and "[i]f the statute is silent or ambiguous on the issue, [the court] will defer at step two to any reasonable agency interpretation." *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 727 (7th Cir. 2004) (quoting *Chevron*, 467 U.S. at 842-43 (1984)). At step one, "the only questions" that are addressed are "whether the statutory language to be

interpreted, on its face, is ambiguous, and whether Congress was silent regarding that ambiguity." *Emerg. Servs. Billing Corp., Inc. v. Allstate Ins. Co.*, 668 F.3d 459, 465-66 (7th Cir. 2012). Interpretative tools that consider language outside the statute are left for step two of the *Chevron* analysis. *Id.* at 466 n. 1. Here, both parties agree and the court concurs that the text of the ADEA is silent as to apprenticeship programs.

At step two, an agency's reasonable interpretation of the statute it administers "must be followed, regardless of whether or not the reviewing court would have come to the same conclusion." *Id.* at 466. To determine whether the agency's interpretation is reasonable, the interpretation is evaluated "in light of the legislative history, the purpose of the statute, and comparative statutes." *Id.*

The Fund makes two arguments why the EEOC's regulation is not a reasonable construction of the statute. First, the Fund argues, the ADEA's silence about apprenticeship programs coupled with the inclusion of apprenticeship programs in Title VII shows that Congress did not intend the ADEA to cover apprenticeship programs. (Def.'s Mem. at 5-6.) The Seventh Circuit has warned, however, that "'inferences from congressional silence are treacherous; oversights are common in the hurly-burly of congressional enactment; omissions are not enactment; and even deliberate omissions are often subject to alternative interpretations.'" *Castro,* 360 F.3d at 729 (quoting *Alto Dairy v. Veneman,* 336 F.3d 560, 566 (7th Cir. 2003)). In that case, the court rejected an argument similar to the Fund's. There the Chicago Housing Authority argued that it was not covered under the Worker Adjustment and Retraining Notification Act ("WARN Act"), notwithstanding a DOL regulation, because Congress specifically included coverage for public sector employees in other acts but not the WARN Act. *Id.* at 728. The Seventh Circuit pointed to a number of statutes in which

10

Congress specifically excluded governmental entities, and concluded that "all we can deem from congressional silence on the issue is just that – that Congress was silent on the issue." *Id.* at 728-29. *See also Bayo v. Napolitano*, 593 F.3d 495, 501 (7th Cir. 2010) (stating that congressional silence "might highlight an issue that Congress did not anticipate or that it chose to leave open. It is under these circumstances that Congress has implicitly delegated authority to the relevant agency to resolve the issue").

Although the ADEA is silent as to apprenticeship programs, other provisions of the ADEA contain specific exclusions and exemptions from coverage. In addition to the exclusion of certain federal entities in the definitions of "employer" and "employment agency" mentioned above, the definition of employee specifically excludes politicians and their staffs. 29 U.S.C. § 630(f). Further, the statute contains specific provisions for the hiring and firing of firefighters and law enforcement officers. *Id.* § 623(j). There are also special rules for bona fide executives or high policymakers. 29 U.S.C. § 631(c). The ADEA's safe harbor provision excludes from coverage a "bona fide seniority system," a "bona fide employee benefit plan," or where age is a "bona fide occupational qualification." *Id.* § 623(f).[2]

Additionally, under its exemption authority, 29 U.S.C. § 628, the EEOC has issued regulations exempting federal and state "special employment programs" for the "long-term unemployed, individuals with disabilities, members of minority groups, older workers, or youth." 29 C.F.R. § 1625.31. The EEOC has also exempted employers from coverage when the employer

---

[2] The Fund also argues that under 29 U.S.C. § 623(f)(2)(B) it cannot be held liable under the ADEA because it is abiding by the terms of a bona fide employee benefit plan. (Def.'s Resp. Mot. Am. Compl. at 6.) The provision, however, states "no such employee benefit plan or voluntary early retirement incentive plan shall excuse the failure to hire any individual . . . because of the age of such individual." 29 U.S.C. § 623(f)(2)(B).

11

provides "benefits for retired participants that are altered, reduced or eliminated when the participant is eligible for Medicare health benefits or for health benefits under a comparable State health benefit plan, whether or not the participant actually enrolls in the other benefit program." *Id.* § 1625.32.

The Fund urges that the inclusion of apprentice programs in Title VII shows that Congress knows how to indicate when it wants to cover apprenticeship programs under a statute.[3] (Def.'s Mem. at 5-6.) On the other hand, the many exclusions contained in the ADEA show that Congress knows how to exclude or exempt programs or behavior from coverage under the ADEA when it so desires. Further, as pointed out by the district court in *Quinn,* 569 F. Supp. at 662, when Congress passed the ADEA, many state age discrimination statutes specifically excluded apprenticeship programs from their coverage. The court there concluded that "[t]he absence of an exemption for apprenticeship programs in the federal legislation, despite congressional awareness of such provision in state laws, is indicative of an intent to not except such programs from the broad proscriptions of the statute." (Def.'s Mem. at 6-7.)

As its second argument, the Fund emphasizes that for almost 30 years both the DOL and the EEOC interpreted the ADEA to exclude apprenticeship programs, and, the Fund argues, by not acting to amend the statute, Congress demonstrated its approval of that interpretation. On the other hand, it has been more than 16 years since the EEOC changed its interpretation to include apprenticeship programs, and Congress has not overturned the EEOC's current regulation. Once

---

[3] The Fund also argues that the DOL regulations that govern apprenticeships programs do not prohibit discrimination based on age. *See* 29 C.F.R. § 30.18 (prohibiting discrimination based on "race, color, religion, national origin, or sex" but not age.) The DOL has made clear, however, "apprenticeship programs are subject to other Federal, State and local laws and regulations regarding Equal Employment Opportunity in employment and training, such as the Americans with Disabilities Act, the Age Discrimination in Employment Act, and Title VII of the Civil Rights Act of 1964." 73 Fed. Reg. 64402, 64416 (Oct. 29, 2008).

again, Congress's inaction in response to the prior interpretation and the EEOC's present interpretation suggests that Congress intended to leave the issue to the agency.  *See Intl. Ass'n of Bridge, Structural & Ornamental Ironworkers v. NLRB*, 946 F.2d 1264, 1271-72 (7th Cir. 1991) (finding that 42 years of congressional inaction with regards to a National Labor Relations Board rule "can be read as endorsement of the Board's exercise of discretion" rather than "approval of a restriction" in the Board's authority); *see also Simmons v. ICC*, 766 F.2d 1177, 1181 (noting "that reliance on the chimerical concepts of congressional 'silence' or 'inaction' as a basis for 'acquiescence or 'ratification' is dubious at best").

Further, the fact that the DOL first interpreted the ADEA as not covering apprenticeship programs has little persuasive value.   To place dispositive weight on the DOL's original interpretation would be contrary to the Supreme Court's statement in *Chevron* that "[a]n initial agency interpretation is not instantly carved in stone.   On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."  *Chevron*, 467 U.S. at 864-65; *see also Bankers Life & Cas. Co. v. U.S.*, 142 F.3d 973, 988 (7th Cir. 1998) (choosing "not to place too much weight" on "argument for the regulation's validity based on its contemporaneity with the passage of the statute"); *Intl. Ass'n of Bridge, Structural & Ornamental Ironworkers,* 946 F.2d at 1270 ("[W]hatever weight a contemporary construction is due, it cannot encroach on the scope of an agency's discretion to revise a rule in light of experience.")

The particulars of this case also illustrate why the inclusion of apprenticeship programs under the ADEA is a reasonable interpretation of the statute.   Snowwhite characterizes the Fund as a "gatekeeper" in that one cannot be work as an apprentice by a NECA contractor or be a member of

the IBEW unless one goes through the Fund's apprenticeship program. (Pl.'s Opp'n at 10.) At oral argument, the Fund's counsel contested that characterization, and stated that one could join the IBEW if one had acquired skills elsewhere and could work for a NECA contractor in a non-apprentice capacity. [*See* dkt 58.] It appears, though, that at the very least, admittance into the apprenticeship program provides the most direct path for aspiring electricians to work for NECA contractors and to gain the skills necessary to join the IBEW. It would be a strange result if NECA and the IBEW, which are both presumably subject to the ADEA, were allowed to create the Fund – the entry path into employment with NECA and membership into the IBEW – which was not subject to the ADEA. *Cf. Papa v. Katy Indus., Inc.*, 166 F.3d 937, 941 (7th Cir. 1999) (stating that as applies to the ADEA, "[t]he privilege of separate incorporation is not intended to allow enterprises to duck their statutory duties").

The *Seafarers* decision is the only one evaluating the validity of the current regulation, 29 C.F.R. § 1625.21, within the *Chevron* framework. There, the court upheld the regulation, finding it to be a reasonable interpretation of the ADEA. *Seafarers Intl. Union*, 394 F.3d at 206. The Fund incorrectly asserts that *Coleman v. New Orleans & Baton Rouge S.S. Pilots Assn.,* 437 F.3d 471 (5th Cir. 2006) is contrary to *Seafarers.* (Def.'s Reply at 7-8.) In *Coleman*, the court found that a boat pilots association that operated an apprenticeship program did not qualify as a "employer," "labor organization," or "employment agency" under the ADEA, and thus avoided having to decide whether apprenticeship programs are categorically not covered by the ADEA or determining the validity of the regulation. *Id.* at 479-81.

Accordingly, the EEOC's regulation that apprenticeship programs are covered by the ADEA is a reasonable interpretation of the statute, and the court defers to the EEOC's interpretation.

14

**B.      Whether the Fund is an labor organization, employer, or employment agency**

The Fund argues correctly that the EEOC's regulation cannot expand the class of entities subject to the ADEA beyond what it provided for in the statute.  (Def.'s Mem. at 3, 11-12.)  *See Coleman*, 437 F.3d. at 480 n.8; *cf. Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) ("We must also reject any suggestion that the EEOC may adopt regulations that are inconsistent with the statutory mandate.  As we have held on prior occasions, its 'interpretation' of the statute cannot supersede the language chosen by Congress."); *Grupo Indus. Camesa v. U.S.*, 85 F.3d 1577, 1579 (Fed. Cir. 1996) ("It is axiomatic that a regulation cannot expand the scope of the statute under which it is promulgated.").  Thus, in order to be covered under the ADEA, the Fund still must meet the statutory definition of an employer, labor organization, or employment agency.  It is important to keep in mind that discovery to date in this case has been limited because parties requested a resolution of the Fund's motion before engaging in further discovery.

**1.      *Labor Organization***

The Fund cites *Amax Coal Co.*, 453 U.S. 322, for the proposition that the Fund as a matter of law is not a labor organization because it is separate from the IBEW.  (Def.'s Mem. at 8-9.)  In *Amax*, the Court held that an employer-selected trustee of an employer-financed benefit fund is not a representative of the employer for "the purposes of collective bargaining or the adjustment of grievances" under the National Labor Relations Act.  *Amax*, 453 U.S. at 338-39.  The Court stated that an "employee benefit fund trustee is a fiduciary whose duty to the trust beneficiaries must

15

overcome any loyalty to the interest of the party that appointed him" and that "the duty of the . . .

trustee . . . is directly antithetical to that of an agent of the appointing party." *Id*. at 331-32, 338.[4]

Snowwhite does not attempt to distinguish or even discuss *Amax,* but instead asserts that the

"CBA reserves a great deal of control over apprentices typical of most labor organizations." (Pl.'s

Opp'n at 6.) At oral argument, Snowwhite's counsel suggested that the Fund may be "more akin"

to an employment agency.

As discussed below, the Fund is not entitled to summary judgment as there are disputed

issues of material fact as to whether the Fund is a "employer" or "employment agency" so there is

no need to decide whether the Fund could be a labor organization.


2.    *Employer*

As previously discussed, under the ADEA, "[t]he term "employer" means a person engaged

in an industry affecting commerce who has twenty or more employees for each working day in each

of twenty or more calendar weeks in the current or preceding calendar year." 29 U.S.C. § 630(b).

The ADEA circularly defines employees as "an individual employed by any employer." *Id*. § 630(f).

The Fund argues that it cannot be an employer because it does not meet the statutory

minimum of 20 employees as it only has six employees. (Def.'s Mem. at 9.) The lowest number

---

[4] The Fund also cites *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316 (1997) wherein the Court held that an apprentice program run by an ERISA fund was subject to a California law that allowed apprentice wages to be paid only if the apprenticeship program was state-approved. (Def.'s Reply at 6.) Although the Fund describes this case as "dispositive" for the proposition that the Fund cannot be a labor organization under the ADEA (*id.*), it is hard to see how *Dillingham* bears at all on the question. If anything, *Dillingham* demonstrates that apprenticeship programs operated by ERISA funds are subject to other laws that regulate apprenticeship programs.

of apprentices in the program pointed to by either party is 17 apprentices. (Def.'s Resp. Add'l Facts ¶¶ 22, 23.) Thus, if the Fund is found to be the employer of the apprentices, it will have over 20 employees and meet the ADEA threshold.

While there is no Seventh Circuit case that directly addresses whether an apprentice can be an "employee" of a joint apprenticeship and training committee, the Seventh Circuit case law indicates that whether an employee-employer relationship exists is a fact-dependant determination that centers around the amount of control that the alleged employer has over the alleged employee. For example, in determining whether a worker is an employee or an independent contractor under the ADEA, the court looks to five factors: "'(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.'" *EEOC v. North Knox School Corp.*, 154 F.3d 744, 747 (7th Cir. 1998) (quoting *Alexander v. Rush North Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996)). No factor is dispositive, but the most important factor is "'the employer's right to control.'" *Id.* (quoting *Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377, 378-79 (7th Cir. 1991)).

Further, under the ADEA an employer can be an "indirect" or "de facto" employer where although "a formal employment relationship may be absent, . . . the putative defendant is so extensively involved with the plaintiff's day to day employment that the putative defendant is the 'real' employer for all intents and purposes." *Kerr v. WGN Cont. Broadcasting Co.*, 229 F. Supp. 2d 880, 886 (7th Cir. 2002.) Under that theory, the key factor is whether the putative employer has

17

the power to hire and fire. *See EEOC v. State of Illinois*, 69 F.3d 167, 171-72 (7th Cir. 1995). There

is also the joint employer theory, where an employee is considered to be employed by more than one

employer. "[F]or a joint employer relationship to exist, each alleged employer must exercise control

over the working conditions of the employee, although the ultimate determination will vary

depending on the specific facts of each case." *See Moldenhauer v. Tazewell-Pekin Consol. Commun.*

*Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008). While there are no Seventh Circuit decisions that speak

directly to the availability of a joint employer theory under the ADEA, district courts within the

circuit and other circuits courts of appeal have found that a joint employer theory is cognizable under

the ADEA. *See, e.g., Donnelly v. Corvest Prop. Trust*, No. 08-CV-2148, 2010 WL 2265712 at *6

(C.D. Ill. June 4, 2010); *Rivas v. Federacion de Asociacions Pecuarias de Puerto Rico*, 929 F.2d

814, 819-822 (1st Cir. 1991).

Here, as argued by Snowwhite, there is evidence to suggest that the Fund has substantial

control over the work of the apprentices. (Pl.'s Sur-Reply at 4-8.) Specifically, Snowwhite points

out that the apprentices are required to sign an "apprenticeship agreement" with the Fund that

"contains the terms and conditions of the employment and training of the apprentice." (*Id*. at 6;

Def.'s Resp. Add'l Facts ¶ 14.) The Fund also has "full authority for issuing all job training

assignments and for transferring apprentices from one employer to the another." (Pl.'s Sur-Reply

at 6; Def.'s Resp. Add'l Facts ¶¶ 10, 11.) If an apprentice is terminated from the program, he or she

is not eligible for jobs under the CBA. (Standards § 21(B).) Snowwhite highlights that the Fund

monitors the performance of the apprentices and can take disciplinary action against the apprentices,

including delaying pay raises. (Pl.'s Sur-Reply at 6; Def.'s Resp. Add'l Facts ¶¶ 15, 16.) The Fund

investigates unsafe work conditions that if not remedied, can create cause for removing an apprentice

from the contractor's employ. (Standards § 3(M).) The Fund also serves as a gatekeeper to the CBA grievance procedures as the apprentice first must submit his grievance to the Fund. (*Id.* § 21(D)(1).) Further, the Fund provides substantial training, including 180 hours of classroom training. (Pl.'s LR Resp. ¶ 10.) The Fund is responsible for providing the apprentices a construction safety course and CPR first aid training. (*Id.* § 14(d).)

The Fund argues that the apprentices cannot be employees because the Fund does not pay them, deduct taxes, or pay payroll tax for the apprentices. (Def.'s Mem. at 9-10.) The Fund also urges that under the CBA, the contractors provide the tools and equipment that are used on site. (Def.'s Resp. Mot. Am. Compl at 9.) The Fund highlights that the Standards provide that the Fund "cannot, and does not, employ apprentices." (Standards § 3(N).) According to the Fund, the contractors set the hours of work and provide health insurance, pension benefits, and workers compensation coverage for the apprentices. (*Id.*) In support of its argument, the Fund cites four out-of-circuit district court cases but does not attempt to link the pertinent facts of those cases to the facts at issue here. (Def.'s Resp. Mot. Am. Compl. at 11.)

Whether the Fund is the employer of the apprentices is a fact-dependant inquiry that depends on the amount of control that the Fund exercises over the apprentice. The facts before the court are sufficient to suggest that summary judgment on the issue of whether the Fund is the employer of the apprentices would be improper, at least at this time when discovery is far from complete.

### 3. *Employment Agency*

Under the ADEA, "[t]he term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer and includes an agent of such

a person; but shall not include an agency of the United States." 29 U.S.C. § 630(c). The regulations provide that the prohibition against age discrimination applies "not only to the referral activities of a covered employment agency but also to the agency's own employment practices." 29 C.F.R. § 1625.3(b).

There is little case law interpreting applying the ADEA's definition of employment agency. In its only case addressing the issue, the Seventh Circuit found that an older applicant to the University of Chicago's medical school had not stated an ADEA claim on the theory that the school was an employment agency under the ADEA. *Cannon v. Univ. of Chicago*, 559 F.2d 1063, 1075-1077 (7th Cir. 1976), *rev'd on other grounds*, 441 U.S. 677 (1979). The court reasoned that the plaintiff's claim "merely amount[ed] to an allegation of discrimination in admission to a university and fail[ed] to state anything beyond a remote connection to discrimination in employment." *Id.* at 1076.

Two district court opinions in the Northern District of Illinois have interpreted the provision. In *Watanabe v. Loyola Univ. of Chicago*, No. 99 C 4820, 2000 WL 876983 at *4-5 (N.D. Ill. July 3, 2000), the district court denied defendant's motion to dismiss, reasoning that it was possible Loyola University's career placement office, as opposed to the admissions office at issue in *Cannon*, could constitute an employment agency as defined by the ADEA. In *Moore v. Ford Motor Co.*, 901 F. Supp. 1293, 1297 (N.D. Ill. 1995), the Ford Motor Company ran a training program for those individuals which the company had selected to run independent dealerships. After the program was completed, Ford would assign the individual to work under a licensed Ford dealer. *Id.* The court stated in dictum that it was "unlikely" that the training placements constituted "acts of an employment agency" under the ADEA. *Id.*

20

The Fund relies on two district court cases from other districts for the proposition that it is not an employment agency under the ADEA. (Def.'s Resp. Mot. Am. Compl. at 11-13.) In *Wynn v. Natl. Broad. Comp., Inc.*, 234 F. Supp. 2d 1067, 1104-08 (C.D. Cal 2002), and *Veasy v. Teach for Am., Inc.*, 868 F. Supp. 2d 688, 699-702 (M.D. Tenn. 2012), the district courts found respectively that a talent agency and Teach for America were not employment agencies under the ADEA. Both of those courts relied on a comparison between the definitions of "employment agency" in the ADEA and Title VII. As opposed to the ADEA's definition, which is limited to any person who "procure[s] employees for an employer," Title VII's definition also includes any person who "procure[s] for employees opportunities to work for an employer." 42 U.S.C. § 2000e(c). The courts in *Wynn* and *Veasy* reasoned that the differing definitions meant that Congress must have intended to exclude some entities from coverage under the ADEA that were included under Title VII. *Wynn*, 234 F. Supp. 2d at 1106-07; *Veasy*, 868 F. Supp. 2d at 701. Specifically, entities that worked primarily for the benefit of an employer (so-called headhunters) were covered under both statutes, but those entities that primarily serve to find employment opportunities for prospective employees were not covered under the ADEA. *Veasy,* 868 F. Supp. 2d at 702.

The Fund argues that it falls under the latter category and states that it "provides a benefit to the apprentices by teaching them a craft" and "procur[ing] on the job learning opportunities." (Def.'s Resp. Mot. Am. Compl. at 12.) The factual record on the present motion, however, is too mixed to conclude that Snowwhite could not establish that the Fund is covered by the ADEA under the analysis applied by the courts in *Wynn* and *Veasey*. First, the Fund was created and is funded exclusively by the NECA members who are signatories to the collective bargaining agreement. (Pl.'s LR Resp. ¶¶ 5, 10, 11.) The apprentices are apparently only placed at those NECA members, and

21

the NECA contractors can only hire apprentices that are trained through the Fund. (Def.'s Resp. Add'l Facts ¶¶ 9-12.) Further, at oral argument, Fund's counsel explained that apprentices were a "boon" for the NECA contractors as apprentices are paid substantially less than a journeyman's wage. [*See* dkt 58.] Taken in the light most favorable to the non-movant Snowwhite, these facts suggest that it is not impossible that the Fund could be seen as primarily providing employees for the NECA contractors rather than providing employment opportunities for its apprentices.

Given the limited precedent from the Seventh Circuit on point and the facts distinguishing this case from *Veasy* and *Wynn*, along with the the fact that discovery here is still at an early stage, at this point it would be premature to decide whether the Fund is an employment agency as defined under the ADEA. Accordingly, the Fund's motion for summary judgment is denied.

## II.      Snowwhite's Motion to Amend

As stated above, Snowwhite's complaint alleges that the Fund is a labor organization as defined by the ADEA. Snowwhite seeks leave to amend his complaint to allege that the Fund is alternatively an employer or an employment agency under the ADEA. (Pl.'s Mot. Am. Compl.) The Fund opposes this amendment on the grounds that it is untimely and futile. (Def.'s Resp. Mot. Am. Compl. 2-3, 5-6.)

Under Fed. R. Civ. P. 15(a)(2), "the court should freely give leave when justice so requires." "As a general matter, Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading." *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). "A district court may deny leave to file an amended complaint in the case of 'undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Id.* (quoting *Airborne Beepers & Video, Inc. v AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007)). "[W]hile a court may deny a motion for leave to file an amended complaint, such denials are disfavored." *Id.*

It is hard to see how the proposed amendment would work any prejudice to the Fund. First, there has been only limited discovery so far in this case. Second, Snowwhite's amendment is not alleging a new claim for relief or even new facts; he is only modifying the legal theory under which his ADEA claim is brought. *See Hatmaker v. Mem. Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) (stating that "plaintiffs in federal courts are not required to plead legal theories"); *NAACP. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir.1992) ("A complaint should limn the grievance and demand relief. It need not identify the law on which the claim rests, and different legal theories therefore do not multiply the number of claims for relief.") The Fund will not be prejudiced by this amendment as the factual allegations in Snowwhite's claim are identical in the original and amended complaint.[5]

The Fund also makes a variety of arguments that Snowwhite's motion to amend should be

---

[5] Citing an ERISA case from the Second Circuit, the Fund also argues that Snowwhite should not be given leave to amend his complaint because a "party cannot amend to create jurisdiction." (Def.'s Reply at 13-14 (citing *Pressroom Unions-Printers League Income Sec. Fund v. Continental Assurance Co.*, 700 F.2d 889, 893 (2d Cir. 1983)).) As discussed above and reiterated here, the argument that Snowwhite failed to show that the Fund meets the definition of "labor organization" is "not a defect of subject matter jurisdiction but an ordinary failure to meet a statutory requirement." *Saperstein*, 188 F.3d at 855 n. 1; *accord Komorowswi,* 162 F.3d at 964.

denied as futile.[6]  As discussed above, it is plausible that the Fund could be a cognizable defendant under the ADEA, and thus the amendment is not futile.  Accordingly, Snowwhite's motion to amend his complaint is granted.

### Conclusion

For the aforementioned reasons, the Fund's motion for summary judgment [dkt 34] is denied, and Snowwhite's motion for leave to file an amended complaint [dkt 63] is granted.  Snowwhite shall file his amended complaint by July 23, 2013.   A status hearing is set for August 6, 2013 to discuss further proceedings in this case.

_____
Geraldine Soat Brown
United States Magistrate Judge

**DATE: July 16, 2013**

---

[6]  The Fund also contends that Snowwhite's claim is barred because he did not timely file with the EEOC when he was first denied admission in 2007, and that punitive damages or compensatory damages for emotional distress are not recoverable under the ADEA.  (Def.'s Resp. Mot. Am. Compl.  at 13-15.)  These arguments are beyond the scope of the Fund's motion for summary judgment and are not addressed here.